## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**JOHN M.,**

        **Plaintiff,**

                                   **Case No. 1:20-cv-15012**

      **v.**                         **Magistrate Judge Norah McCann King**

**KILOLO KIJAKAZI,**
**Acting Commissioner of Social Security,**

        **Defendant.**

## OPINION AND ORDER

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff John M. for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* Plaintiff appeals from the final decision of the Commissioner of Social Security denying that application.[1] After careful consideration of the entire record, including the entire administrative record, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f). For the reasons that follow, the Court affirms the Commissioner's decision.

## I.    PROCEDURAL HISTORY

On August 22, 2014, Plaintiff filed an application for benefits, alleging that he has been disabled since June 1, 2009, due to problems with his knees, diabetes, high blood pressure, and high cholesterol. R. 39, 40, 46, 140−41. The application was denied initially and upon reconsideration. R. 57−61, 63−65. Plaintiff sought a *de novo* hearing before an administrative

---

[1] Kilolo Kijakazi, the Acting Commissioner of Social Security, is substituted as Defendant in her official capacity. *See* Fed. R. Civ. P. 25(d).

law judge. R. 66−68. Administrative Law Judge Daniel Curran ("ALJ Curran") held a hearing on August 9, 2017, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert. R. 26−38. In a decision dated October 11, 2017, ALJ Curran concluded that Plaintiff was not disabled within the meaning of the Social Security Act from June 1, 2009, Plaintiff's alleged disability onset date, through December 31, 2013, the date on which Plaintiff was last insured for benefits ("the 2017 decision"). R. 15−19. Plaintiff timely filed an appeal in this Court from that decision pursuant to 42 U.S.C. § 405(g). R. 643−49. On January 29, 2019, United States District Judge Jose L. Linares reversed that decision, concluding that ALJ Curran had erred in finding that Plaintiff's arthritis in his right knee was not severe, and remanded the action for further proceedings. R. 650−61.

On October 3, 2019, ALJ Nicholas Cerulli ("the ALJ"), held a second administrative hearing, at which Plaintiff, who was again represented by counsel, testified, as did a vocational expert. R. 604−42. In a decision dated October 28, 2019, the ALJ concluded that Plaintiff was not disabled at any time from June 1, 2009, Plaintiff's alleged disability onset date, through December 31, 2013, his date last insured ("the 2019 decision"). R. 581−99. The 2019 decision became the final decision of the Acting Commissioner of Social Security when the Appeals Council declined review on September 21, 2020. R. 571−77. Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g). ECF No. 1. On April 26, 2021, Plaintiff consented to disposition of the matter by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Rule 73 of

the Federal Rules of Civil Procedure. ECF No. 10.[2] On that same day, the case was reassigned to

the undersigned. ECF No. 11. The matter is now ripe for disposition.

## II.    LEGAL STANDARD

### A.    Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the

authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204

F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to

determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d

Cir. 2000); *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). The United States Supreme Court has

explained this standard as follows:

> Under the substantial-evidence standard, a court looks to an existing administrative
> record and asks whether it contains sufficien[t] evidence to support the agency's
> factual determinations. And whatever the meaning of substantial in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial evidence, this
> Court has said, is more than a mere scintilla. It means – and means only – such
> relevant evidence as a reasonable mind might accept as adequate to support a
> conclusion.

*Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal citations and quotation marks

omitted); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal

quotations omitted); *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009)

(citations and quotations omitted); *K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018

WL 1509091, at *4 (D.N.J. Mar. 27, 2018).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot

be set aside merely because the Court "acting de novo might have reached a different

---

[2]The Commissioner has provided general consent to Magistrate Judge jurisdiction in cases
seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot
Project (D.N.J. Apr. 2, 2018).

3

conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484, 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (stating that substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

4

Although an ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981).  Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, a court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210,

221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016). A decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518.

### B.    Sequential Evaluation Process

The Social Security Act establishes a five-step sequential evaluation process for determining whether a plaintiff is disabled within the meaning of the statute. 20 C.F.R. § 404.1520(a)(4). "The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five." *Smith v. Comm'r of Soc. Sec*., 631 F.3d 632, 634 (3d Cir. 2010) (citing *Poulos v. Comm'r of Soc. Sec*., 474 F.3d 88, 92 (3d Cir. 2007)).

At step one, the ALJ determines whether the plaintiff is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b).  If so, then the inquiry ends because the plaintiff is not disabled.

At step two, the ALJ decides whether the plaintiff has a "severe impairment" or combination of impairments that "significantly limits [the plaintiff's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). If the plaintiff does not have a severe impairment or combination of impairments, then the inquiry ends because the plaintiff is not disabled.  Otherwise, the ALJ proceeds to step three.

At step three, the ALJ decides whether the plaintiff's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). If so, then the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id.* at § 404.1509. Otherwise, the ALJ proceeds to step four.

At step four, the ALJ must determine the plaintiff's residual functional capacity ("RFC") and determine whether the plaintiff can perform past relevant work. 20 C.F.R. § 404.1520(e), (f). If the plaintiff can perform past relevant work, then the inquiry ends because the plaintiff is not disabled. Otherwise, the ALJ proceeds to the final step.

At step five, the ALJ must decide whether the plaintiff, considering the plaintiff's RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). If the ALJ determines that the plaintiff can do so, then the plaintiff is not disabled. Otherwise, the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

## III.    THE ALJ's 2019 DECISION AND APPELLATE ISSUES

Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013. R. 586. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between June 1, 2009, his alleged disability onset date, and December 31, 2013, the date on which Plaintiff was last insured. *Id.*

At step two, the ALJ found that Plaintiff's degenerative joint disease and diabetes mellitus were severe impairments. *Id*. The ALJ also found that Plaintiff's diagnosed obesity and mild arthritis in the right foot were not severe. R. 587.

At step three, the ALJ found that Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. *Id*.

At step four, the ALJ found that Plaintiff had the RFC to perform medium work subject to various additional limitations. R. 587–91. The ALJ also found that this RFC permitted the performance of Plaintiff's past relevant work as a pipe coverer and insulator. R. 591. The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act from June 1, 2009, Plaintiff's alleged disability onset date, through December 31, 2013, the date on which he was last insured. *Id*.

Plaintiff disagrees with the ALJ's findings at step four and asks that the decision of the Commissioner be reversed and remanded with directions for the granting of benefits. *Plaintiff's Memorandum of Law,* ECF No. 14; *Plaintiff's Reply Brief*, ECF No. 16. The Acting Commissioner takes the position that her decision should be affirmed in its entirety because the ALJ's 2019 decision correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *Defendant's Brief Pursuant to Local Civil Rule 9.1,* ECF No. 15.

## IV.   DISCUSSION

### A.   RFC AND PLAINTIFF'S SUBJECTIVE STATEMENTS

Plaintiff raising several challenges to the ALJ's RFC determination. *Plaintiff's Memorandum of Law*, ECF No. 14, pp. 6–20; *Plaintiff's Reply Brief*, ECF No. 16, pp. 3–6. This Court disagrees.

A claimant's RFC is the most that a claimant can do despite his limitations. 20 C.F.R. §
404.1545(a)(1). At the administrative hearing stage, the administrative law judge is charged with
determining the claimant's RFC. 20 C.F.R. §§ 404.1527(e), 404.1546(c); *see also Chandler
v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining
physicians or State agency consultants—must make the ultimate disability and RFC
determinations.") (citations omitted). When determining a claimant's RFC, the ALJ has a duty to
consider all the evidence. *Plummer*, 186 F.3d at 429. However, the ALJ need include only
"credibly established" limitations. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *see
also Zirnsak v. Colvin*, 777 F.3d 607, 615 (3d Cir. 2014) (stating that the ALJ has discretion to
choose whether to include "a limitation [that] is supported by medical evidence, but is opposed
by other evidence in the record" but "[t]his discretion is not unfettered—the ALJ cannot reject
evidence of a limitation for an unsupported reason" and stating that "the ALJ also has the
discretion to include a limitation that is not supported by any medical evidence if the ALJ finds
the impairment otherwise credible").

In the case presently before the Court, the ALJ determined that Plaintiff had the RFC to
perform a limited range of medium work, as follows:

> After careful consideration of the entire record, the undersigned finds that, through
> the date last insured, the claimant had the residual functional capacity to perform
> medium work as defined in 20 CFR 404.1567(c) except frequent pushing and
> pulling with the right lower extremity and frequent climbing, balancing, stooping,
> kneeling, crouching and crawling.

R. 587. In making this determination, the ALJ detailed years of record evidence regarding
Plaintiff's severe impairments of diabetes and knee impairment, finding, *inter alia*, as follows:

> The evidence of record available prior to the date last insured does not support the
> claimant's allegations of disability during the relevant period at issue, from June 1,
> 2009 through December 31, 2013. *There is in general relatively little treatment
> evidence prior to the date last insured with regards the claimant's knee and*

9

*diabetes impairments.* Diabetes was noted in primary care and hospital records to be present as early as 2006 (it was considered "new onset" at that time, Ex. 2F), *but there is no indication of any serious complications of that disease [diabetes] prior to the December 31, 2013 date last insured. Additional periodic primary care notes indicate diabetes mellitus as an ongoing condition, but do not suggest prior to the date last insured that he was experiencing any serious difficulties as the result of this condition*; he was not insulin-dependent, there were no clinical signs of neuropathy, retinopathy, serious blood sugar fluctuations, organ damage, or chronic fatigue (Ex. 6F). The claimant appeared to suggest in his testimony that he was experiencing neuropathy affecting the legs prior to the date last insured, but this is not supported by the record. *The claimant in fact was referred to a podiatrist in October 2013, just prior to the date last insured, in order to evaluate his lower extremities for neuropathy and other signs of diabetes complication, but this podiatrist noted an "essentially normal" diabetic foot exam* (Ex. 8F; see also page 13); there were some indications of toenail fungus and early ingrown toenails, but no indication of sensation/neurological deficits, swelling, temperature changes, or lesions. *There was no indication of any gait problems.* As previously noted, the claimant in March 2014 exhibited a "mild limp" associated with an episode of right foot tenderness (likely linked to mild arthritis in some foot joints, Exs. 4F, 5F), but *there is no indication of such foot problems or of related gait deficits prior to December 31, 2013*. In 2014, the claimant was also treated by this podiatrist for ingrown toenails (which likely resulted in some pain, Ex. 8F), but again there is no indication of any diabetes-related or other foot problems which would have been expected to result in any serious difficulties with walking or physical activity in general.

With regard to the claimant's knee impairments, the claimant appears to have sought treatment specifically for pain in the right knee in September 2013 (Ex. 22F). At that time, he noted some tenderness and exhibited crepitus of the knee with range of motion, but there was no swelling or joint instability and no apparent indication during that examination of problems with gait or the need to use crutches. *This report does, however, mention that an x-ray was performed which suggested the presence of some degenerative changes in that joint (Ex. 22F). The claimant in October 2013 likewise exhibited some crepitus with movement of the knee, and he reported tenderness, but there was again no apparent indication of gait instability (Ex. 4F). In November 2013 he received injection treatment in the knee (Ex. 4F). Otherwise, there is no indication in these records that, prior to December 2013, the claimant experienced any serious, debilitating knee symptoms*; again, there is no indication in these handful of records of gait abnormality, strength loss, joint instability, intractable pain (other than the injections, he used only nonnarcotic pain medication apparently), or a need to employ crutches when walking more than a few feet. Again, in March 2014, after the date last insured, he exhibited merely a "mild limp" on exam, but this appears to be due to some transitory right foot problems and not because of his knee symptoms (Ex. 4F).

10

R. 589 (emphasis added). The ALJ acknowledged that, at some point after the date on which Plaintiff was last insured, Plaintiff apparently experienced worsening and serious knee problems. For example, Plaintiff was referred to an orthopedic specialist for evaluation of his knees in February 2015 and, although he exhibited a normal gait and full strength in the legs on examination, he also exhibited "end stage" arthritic changes in both knee joints. R. 589−90. The ALJ noted that Plaintiff underwent conservative treatment−*i.e.,* knee injections and physical therapy−in 2015 and early 2016 and that, by June 2016, Plaintiff "was working out in the gym three times per week and even doing cardio work (exercise cycles were mentioned, but that he was able to visit the gym three times per week strongly suggests that, even at that time, the claimant was able to ambulate independently and over significant distances, Ex. 10F)." R. 590. The ALJ further noted that Plaintiff underwent total knee replacements in 2016 and 2017. *Id.* The ALJ went on to explain as follows:

> Given that the claimant by early 2015 was exhibiting "end-stage" degenerative disease in the knees, it is likely that he experienced at least some degree of degenerative disease in one or both knees even as of December 2013; indeed, as noted, the claimant did in fact exhibit some degenerative disease at least in the right knee in September 2013, per an x-ray (though the degree of disease was not specified). *However, the undersigned finds that it cannot be reasonably inferred from these 2015-2017 records that the claimant was experiencing very serious walking/standing and other physical limitations due to his knees or any other cause prior to 2014.* Again, there were no clinical indications of significant gait problems prior to 2014; there were no indications of active neuropathy affecting the lower extremities prior to the date last insured; there is no obvious indication of a need for crutches, a cane or any other assistive device. *There was no mention of disease so serious that surgery or knee replacement was contemplated prior to 2015; there was no indication of a need for pain management or other treatment for serious, intractable knee pain prior to the date last insured.* Moreover, even as of June 2016, the claimant appeared capable of visiting the gym regularly and engaging in significant exercise; this strongly suggests that he was capable of leaving his home and engaging in independent activity, and this in turn suggests an ability to ambulate and engage in normal activity to an extent far greater than that alleged by the claimant. *Again, the claimant suggested that, even as of December 2013, he was unable to walk even a few feet without using crutches and that he was required to elevate his legs for most of the day; none of the medical evidence dated prior to*

> *2014 suggests such serious deficits; indeed, much of the evidence dating from 2014-2016 suggests he was more capable than he alleged.* The claimant's allegations of very serious physical limitations prior to the date last insured are not supported by the record.

*Id.* (emphasis added). The ALJ also explained his findings regarding Plaintiff's limitations, reasoning as follows:

> *As the clinical record prior to the date last insured suggests no serious gait problems, strength deficits, chronic fatigue/weakness, or other serious symptoms, the claimant prior to 2014 should have been capable of performing medium exertion. Again, the medical evidence dating from prior to 2014 gives no reasonable indication, in the undersigned's view, that such work would not have been possible for the claimant to perform on a fulltime basis.* He is given some additional restrictions given that, at the very least, he exhibited some knee crepitus and tenderness at times in late 2013; he is limited only to frequent postural activities (stooping, kneeling, climbing, e.g.) as detailed in the above residual functional capacity assessment. He is likewise limited to frequent pushing/pulling with the right lower extremity, which appears to have been the most significantly affected joint prior to 2014. *There is no reasonable indication that additional or more restrictive limitations would have been warranted prior to December 31, 2013.*

R. 590−91 (emphasis added); *see also* R. 591 (noting that "[t]he record does not contain a relevant medical opinion regarding physical capabilities which dates from the period under consideration"). In the view of this Court, this record contains substantial evidence to support the ALJ's RFC determination. *See Zirnsak*, 777 F.3d at 615; *Rutherford*, 399 F.3d at 554; *Plummer*, 186 F.3d at 429.

Plaintiff, however, challenges this determination on a number of bases. Plaintiff argues that the ALJ failed to properly consider his severe impairment of diabetes and non-severe impairment of obesity when fashioning the RFC. *Plaintiff's Memorandum of Law*, ECF No. 14, pp. 19−20; *Plaintiff's Reply Brief*, ECF No. 16, pp. 5−6. Plaintiff specifically complains that the ALJ's finding at step two of the sequential evaluation that Plaintiff's diabetes was a severe impairment "by definition, necessitates that this impairment presents with symptoms that significantly impede the Plaintiff's ability to function" and that "the ALJ was then required to

explain on a function-by-function basis the ways in which he found the Plaintiff's diabetes impacts his ability to perform work activities." *Plaintiff's Memorandum of Law*, ECF No. 14, p. 19; *see also Plaintiff's Reply Brief*, ECF No. 16, p. 5 (contending that a finding at step four that his diabetes did not present any "serious complications" "is contrary to the ALJ's own finding of severity at step 2 of the analysis"). Plaintiff also argues that the ALJ "simply discarded the Plaintiff's obesity at Step 2 finding it nonsevere without considering the impairment at any stage of the analysis thereafter[,]" including failing to consider it in combination with other non-severe and severe impairments. *Plaintiff's Memorandum of Law*, ECF No. 14, pp. 19−20; *see also Plaintiff's Reply Brief*, ECF No. 16, p. 5 (arguing that "Plaintiff's obesity was significantly more than 'mild' at every point in time documented in his record" and that, combined with his diabetes and degenerative disc disease, "rendered him incapable of the strenuous demands of medium exertion").

Plaintiff's arguments are not well taken. While it is true that the ALJ found that Plaintiff's diabetes was a severe impairment at step two, the United States Court of Appeals for the Third Circuit has instructed that "no incantations are required at steps four and five simply because a particular finding has been made at steps two and three. Those portions of the disability analysis serve distinct purposes and may be expressed in different ways." *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 209 (3d Cir. 2019). Because the RFC is the most that a claimant can do despite his limitations, the RFC "'requires a more detailed assessment [of the areas of functional limitation] by itemizing various functions contained in the broad [functional limitation] categories'" and, "unlike the findings at steps two and three, the RFC 'must be expressed in terms of work-related functions[.]'" *Id*. (quoting SSR 96-8P, at *4, 6). "In short, the findings at steps two and three will not necessarily translate to the language used at steps four

and five." *Id*. Moreover, as noted earlier, an ALJ need include only "credibly established" limitations. *Rutherford*, 399 F.3d at 554. Here, as detailed above, the ALJ carefully considered Plaintiff's diabetes and any limitations flowing from that severe impairment prior to December 31, 2013, the date on which Plaintiff was last insured, and explained why the record did not warrant any additional or more restrictive limitations. R. 589−91. Accordingly, the Court cannot conclude that the ALJ committed reversible error when considering Plaintiff's diabetes and crafting the RFC.

As to Plaintiff's obesity, the ALJ found at step two that Plaintiff's obesity was not severe and explicitly stated that he considered this condition in combination with Plaintiff's other impairments, explaining as follows:

> The claimant appears to have been mildly obese prior to the alleged onset date, but there is no indication in the record prior to the date last insured that this condition imposed any additional restrictions in combination with the claimant's severe impairments. Indeed, as will be detailed below there is little indication of serious deficits associated with his condition prior to the date last insured. His obesity is not severe in this case.

R. 587. The Court finds no error with the ALJ's assessment in this regard. *See Rutherford*, 399 F.3d at 553 (finding remand unwarranted because it would not affect the outcome of the case where the claimant "never mentioned obesity as a condition that contributed to her inability to work, even when asked directly by the ALJ to describe her impairments" and that the claimant's "generalized response [that her weight makes it more difficult to perform certain physical tasks] is not enough to require a remand, particularly when the administrative record indicates clearly that the ALJ relied on the voluminous medical evidence as a basis for his findings regarding her limitations and impairments"); *see also Romero v. Comm'r of Soc. Sec.*, No. CV 18-16806, 2020 WL 2301444, at *2 (D.N.J. May 8, 2020) (rejecting conclusory contention that ALJ's error in failing to consider obesity at any point in decision justifies

remand and noting that "the *Diaz* Court acknowledged the continuing vitality of *Rutherford*")
(citations omitted). In arguing that the ALJ failed to properly evaluate his obesity, Plaintiff does
not explain why his obesity is severe nor does he identify any limitations caused by his obesity
beyond those limitations found by the ALJ. *Plaintiff's Memorandum of Law*, ECF No. 14, pp.
19–20; *see also Plaintiff's Reply Brief*, ECF No. 16, p. 5. Notably, Plaintiff did not identify
obesity as a disability in his application for benefits. R. 39–40. Moreover, Plaintiff offers no
explanation of how further consideration of his obesity would result in a different outcome. *See
Shinseki v. Sanders*, 556 U.S. 396, 409–10 (2009) ("[T]he burden of showing that an error is
harmful normally falls upon the party attacking the agency's determination. . . . [T]he party
seeking reversal normally must explain why the erroneous ruling caused harm."). Based on this
record, this Court concludes that the ALJ properly considered Plaintiff's obesity. *See
Rutherford*, 399 F.3d at 553; *see also Carter v. Comm'r Soc. Sec.*, 805 F. App'x 140, 143 (3d
Cir. 2020) ("In any event, remand to reconsider her combined impairments is not required
because Carter has relied on the language of SSR 02-1p stating that obesity *can* impair one's
ability to perform basic work activities rather than specifying *how* her obesity or headaches
affected her ability to perform basic work activities" and that the claimant "does not point to
any medical evidence that her impairments, determinable or not, limit her ability to perform
work activities") (emphasis in original); *Tietjen v. Berryhill*, No. CV 17-8030, 2019 WL
1238830, at *4 (D.N.J. Mar. 18, 2019) (rejecting the argument that the ALJ failed to properly
consider the claimant's obesity where the claimant "failed to specify how her obesity met the
disability criteria contained in the SSR and how her obesity precluded her from performing
sedentary work with postural and environmental limitations, as the ALJ concluded she could"
and where the claimant "failed to list obesity as an illness, injury, or condition constituting a

15

disability in her application for SSI and SSDI benefits"); *cf. Woodson v. Comm'r Soc. Sec.*, 661

F. App'x 762, 765–66 (3d Cir. 2016) (finding any error in the ALJ's analysis of obesity at step

three would be harmless because the claimant "never explains how, even if the ALJ's analysis

was lacking, the deficiency was harmful to his claims. Woodson only says in very vague terms

that an actual discussion of his impairments would lead to the conclusion that he was disabled

at step three" and the claimant "has not affirmatively pointed to specific evidence that

demonstrates he should succeed at step three"); *Dias v. Saul*, No. 3:17CV1812, 2019 WL

4750268, at *4–5 (M.D. Pa. Sept. 30, 2019) (affirming the denial of benefits where "the

plaintiff's medical records are nearly devoid of references to his obesity. Plaintiff himself is

unable to point to any restrictions or limitations in the medical record due to his obesity which

must be considered" and finding that a single reference to pain relating to the claimant's obesity

did not show "how his obesity resulted in limitations on his ability to perform basic work

activities").

      Plaintiff also contends that the ALJ erred in considering his subjective complaints.

*Plaintiff's Memorandum of Law*, ECF No. 14, pp. 6−12; *Plaintiff's Reply Brief*, ECF No. 16, pp.

3−6. Plaintiff's arguments are not well taken. "Subjective allegations of pain or other symptoms

cannot alone establish a disability." *Miller v. Comm'r of Soc. Sec.*, 719 F. App'x 130, 134 (3d

Cir. 2017) (citing 20 C.F.R. § 416.929(a)).  Instead, objective medical evidence must corroborate

a claimant's subjective complaints. *Prokopick v. Comm'r of Soc. Sec.*, 272 F. App'x 196, 199 (3d

Cir. 2008) (citing 20 C.F.R. § 404.1529(a)).  Specifically, an ALJ must follow a two-step process

in evaluating a claimant's subjective complaints. SSR 16-3p, 2016 WL 1119029 (March 16,

2016). First, the ALJ "must consider whether there is an underlying medically determinable

physical or mental impairment(s) that could reasonably be expected to produce an individual's

symptoms, such as pain." *Id.* "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities[.]" *Id.*; *see also Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) ("[Evaluation of the intensity and persistence of the pain or symptom and the extent to which it affects the ability to work] obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it.") (citing 20 C.F.R. § 404.1529(c)). In conducting this evaluation, an ALJ must consider the objective medical evidence as well as other evidence relevant to a claimant's subjective symptoms. 20 C.F.R. § 404.1529(c)(3) (listing the following factors to consider: daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate pain or other symptoms; treatment, other than medication, currently received or have received for relief of pain or other symptoms; any measures currently used or have used to relieve pain or other symptoms; and other factors concerning your functional limitations and restrictions due to pain or other symptoms). Finally, an "ALJ has wide discretion to weigh the claimant's subjective complaints, *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983), and may discount them where they are unsupported by other relevant objective evidence." *Miller*, 719 F. App'x at 134 (citing 20 C.F.R. § 416.929(c)); *see also Izzo v. Comm'r of Soc. Sec.,* 186 F. App'x 280, 286 (3d

Cir. 2006) ("[A] reviewing court typically defers to an ALJ's credibility determination so long as there is a sufficient basis for the ALJ's decision to discredit a witness.").[3]

Here, the ALJ followed this two-step evaluation process. The ALJ specifically considered Plaintiff's subjective complaints. R. 587–91. The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause symptoms, but that Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." R. 588. As previously discussed, the ALJ detailed years of medical evidence and record testimony to support his findings. R. 588–91. The ALJ also specifically noted that Plaintiff "suggested that, even as of December 2013, he was unable to walk even a few feet without using crutches and that he was required to elevate his legs for most of the day; none of the medical evidence dated prior to 2014 suggests such serious deficits" and that "much of the evidence dating from 2014-2016 suggests he was more capable than he alleged. The claimant's allegations of very serious physical limitations prior to the date last insured are not supported by the record." R. 590. In the view of this Court, this record provides substantial support for the ALJ's decision to discount Plaintiff's subjective statements as inconsistent with the record evidence. *Van Horn*, 717 F.2d at 873; *Miller*, 719 F. App'x at 134; *Izzo*, 186 F. App'x at 286.

---

[3]SSR 16-3p superseded SSR 96-7p on March 26, 2016, and eliminated the use of the term "credibility." SSR 16-3p. However, "while SSR 16-3P clarifies that adjudicators should not make statements about an individual's truthfulness, the overarching task of assessing whether an individual's statements are consistent with other record evidence remains the same." *Levyash v. Colvin*, No. CV 16-2189, 2018 WL 1559769, at *8 (D.N.J. Mar. 30, 2018).

Plaintiff, however, contests the ALJ's finding in this regard on a number of bases. Plaintiff challenges the ALJ's reasoning that there was "no indication of a need for pain management or other treatment for serious intractable knee pain prior to the date last insured[,]" R. 590, by pointing to knee injections that he received from his treating physician, Christopher T. Carey, M.D., in September 2013 through November 2013. *Plaintiff's Memorandum of Law*, ECF No. 14, pp. 8–9 (citations omitted); *Plaintiff's Reply Brief*, ECF No. 16, pp. 3–4 (citations omitted). However, as detailed above, the ALJ expressly considered Dr. Carey's injection treatments, but nevertheless concluded, by way of explanation and citation to the record, that this conservative treatment did not establish "serious intractable knee pain prior to the date last insured." R. 589 (noting, *inter alia*, that, prior to December 2013, "there is no indication in these handful of records of gait abnormality, strength loss, joint instability, intractable pain (other than the injections, he used only nonnarcotic pain medication apparently), or a need to employ crutches[4] when walking more than a few feet" and that in March 2014, after the date last insured, Plaintiff "exhibited merely a 'mild limp' on exam, but this appears to be due to some transitory right foot problems and not because of his knee symptoms"). To the extent that Plaintiff insists that the ALJ should have viewed Dr. Carey's treatment records as evidence of serious intractable pain because the injections provided no long-term relief and because he ultimately needed knee replacement surgery, Plaintiff's argument boils down to a request that this Court reweigh the evidence, an invitation that this Court declines. *See Chandler*, 667 F.3d at 359 ("Courts are not permitted to reweigh the evidence or impose their own factual determinations [under the substantial evidence standard].").

---

[4] The ALJ also noted earlier in his decision that Plaintiff "reported using crutches at times during this period [prior to the date last insured], but this is not confirmed by the medical evidence available during this period." R. 587.

Plaintiff also argues that the ALJ improperly discounted Plaintiff's statements when the ALJ found that there was no mention of a disease so serious that surgery or knee replacement was contemplated prior to 2015, pointing to his own hearing testimony and evidence that, one year after the date on which he was last insured, Plaintiff's knee was described as being "end stage" and that in February 2015 he could walk only 100 feet. *Plaintiff's Memorandum of Law*, ECF No. 14, pp. 9–10 (citations omitted). As a preliminary matter, the ALJ properly discounted Plaintiff's subjective statements for the reasons previously discussed. In addition, as detailed above, the ALJ expressly considered that Plaintiff exhibited "end stage" arthritic changes in both knee joints in February 2015, but also noted that, in the same exam, Plaintiff exhibited a normal gait and full leg strength. R. 590. The ALJ further explained that, although Plaintiff exhibited some degenerative disease in one or both knees as of December 2013, the ALJ found that "that it cannot be reasonably inferred from these 2015-2017 records that the claimant was experiencing very serious walking/standing and other physical limitations due to his knees or any other cause prior to 2014." R. 590 (reciting supporting medical evidence). Moreover, to the extent that Plaintiff points to evidence that he believes supports his position, the Court "will uphold the ALJ's decision even if there is contrary evidence that would justify the opposite conclusion, as long as the 'substantial evidence' standard is satisfied." *Johnson v. Comm'r of Soc. Sec.*, 497 F. App'x 199, 201 (3d Cir. 2012) (citing *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986)). The Court therefore finds no error with the ALJ's reasoning in this regard. *Id.*; *see also Hatton v. Comm'r of Soc. Sec. Admin.*, 131 F. App'x 877, 880 (3d Cir. 2005) ("When 'presented with the not uncommon situation of conflicting medical evidence . . . [t]he trier of fact has the duty to resolve that conflict.'") (quoting *Richardson v. Perales*, 402 U.S. 389, 399 (1971)); *Fargnoli*, 247 F.3d at 38.

Plaintiff also complains that the ALJ erred in finding that there were no clinical indications of significant gait problems prior to 2014. *Plaintiff's Memorandum of Law*, ECF No. 14, p. 10. However, Plaintiff relies on only his own testimony to support this argument. *See id*. Notably, the ALJ explained, with citation to objective medical evidence, why the record reflected no significant gait problems prior to the date on which Plaintiff was last insured. R. 589 (noting that in September 2013 Plaintiff exhibited "no swelling or joint instability and no apparent indication during that examination of problems with gait or the need to use crutches"; in March 2014 Plaintiff "exhibited a 'mild limp' associated with an episode of right foot tenderness (likely linked to mild arthritis in some foot joints, Exs. 4F, 5F), but there is no indication of such foot problems or of related gait deficits prior to December 31, 2013"; and that treatment for ingrown toenails in 2014 provided "no indication of any diabetes-related or other foot problems which would have been expected to result in any serious difficulties with walking or physical activity in general"), 590 (noting that Plaintiff exhibited a normal gait and full strength in the legs on examination in February 2015).

Plaintiff also complains that the ALJ improperly discounted his subjective statements because Plaintiff "was purportedly visiting the gym 'regularly[,]'" arguing that the ALJ ignored the fact that Plaintiff engaged in this activity only because his physician encouraged him to lose weight and also ignored Plaintiff's testimony that he was limited to only upper body weight training. *Plaintiff's Memorandum of Law*, ECF No. 14, pp. 10–11 (citing R. 590, 627–28). Plaintiff's argument is not well taken. The ALJ noted that, in June 2016, Plaintiff "was working out in the gym three times per week and even doing cardio work (exercise cycles were mentioned, but that he was able to visit the gym three times per week strongly suggests that, even at that time, the claimant was able to ambulate independently and over significant distances,

Ex. 10F)." R. 590; *see also id.* ("Moreover, even as of June 2016, the claimant appeared capable

of visiting the gym regularly and engaging in significant exercise; this strongly suggests that he

was capable of leaving his home and engaging in independent activity, and this in turn suggests

an ability to ambulate and engage in normal activity to an extent far greater than that alleged by

the claimant."). The Court finds no error in the ALJ's consideration of Plaintiff's ability to work

out on a regular basis when discounting Plaintiff's subjective statements. *See* 20 C.F.R. §

404.1529(c)(3)(i) (providing that an ALJ may consider a claimant's daily activities); *Loneker v.*

*Comm'r of Soc. Sec.*, No. 17-2006, 2018 WL 5784996, at *4 (D.N.J. Nov. 5, 2018) ("The ALJ's

decision is consistent with the Third Circuit's recognition that "[a]lthough 'any statements of the

individual concerning his or her symptoms must be carefully considered,' the ALJ is not required

to credit them, particularly where such statements are undermined by evidence of a more active

lifestyle.") (quoting *Chandler*, 667 F.3d at 363); *Motes v. Colvin*, No. 3:16-CV-1309, 2017 WL

1329472, at *12 (M.D. Pa. Apr. 11, 2017) (finding no error where the ALJ considered, *inter alia*,

that the claimant "reported going to the gym at least three times a week" when discounting

Plaintiff's subjective statements). In any event, consideration of Plaintiff's ability to exercise was

but one factor that the ALJ considered when discounting Plaintiff's subjective statements. R.

588–91.

Accordingly, the Court concludes that the ALJ sufficiently explained his reasoning in

assessing Plaintiff's subjective complaints, and the ALJ's findings in this regard are supported by

substantial evidence in the record and are therefore entitled to this Court's deference. *See* SSR

16-3p; *Miller*, 719 F. App'x at 134; *cf. Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x. 761, 765

(3d Cir. 2009) ("Credibility determinations as to a claimant's testimony regarding pain and other

subjective complaints are for the ALJ to make.") (citing *Van Horn v. Schweiker*, 717 F.2d 871,

873 (3d Cir. 1983)); *Davis v. Comm'r Soc. Sec.*, 105 F. App'x 319, 322 (3d Cir. 2004) (finding that the ALJ sufficiently evaluated the plaintiff's testimony where "the ALJ devoted two pages to a discussion of claimant's subjective complaints and cited Claimant's daily activities and objective medical reports").

In short, for all these reasons, the Court concludes that the ALJ's findings regarding Plaintiff's RFC are consistent with the record evidence and enjoy substantial support in the record.

### B.    PAST RELEVANT WORK

Finally, Plaintiff argues that the ALJ's determination that Plaintiff could perform his past relevant work is not supported by substantial evidence. *Plaintiff's Memorandum of Law*, ECF No. 14, pp. 20–22; *Plaintiff's Reply Brief*, ECF No. 16, p. 2. This Court disagrees.

At step four, "[t]he claimant bears the burden of demonstrating an inability to return to [his] past relevant work." *Plummer*, 186 F.3d at 428. "Past relevant work is work that [the claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. § 404.1560(b)(1). An ALJ must consider whether the claimant has the RFC to perform his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). In making this assessment,

> (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity; (2) the ALJ must make findings of the physical and mental demands of the claimant's past work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

*Garibay v. Comm'r of Soc. Sec.*, 336 F. App'x 152, 158 (3d Cir. 2009) (quoting *Burnett,* 220 F.3d at 120). SSR 82-62 identifies the evidence that an ALJ should consider in making this determination, particularly the claimant's statements about past work:

> The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level, exertional demands and nonexertional demands of such work. Determination of the claimant's ability to do [past relevant work] requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the Dictionary of Occupational Titles, etc., on the requirements of the work as generally performed in the economy.

SSR 82-62; *see also Garibay*, 336 F. App'x at 158 (stating that, when considering whether the claimant retains the capacity to perform the functional demands and job duties of the job as ordinarily required by employers, "the ALJ may rely on job descriptions found in the Dictionary of Occupational Titles ("DOT")").

When evaluating vocational evidence, an ALJ should determine whether "the claimant retains the capacity to perform the particular functional demands and job duties peculiar to an individual job as he or she actually performed it" or whether "the claimant retains the capacity to perform the functional demands and job duties of the job as ordinarily required by employers throughout the national economy." SSR 82-61. In connection with this latter consideration, "if the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job, but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be 'not disabled.'" *Id*.

Here, the ALJ determined that Plaintiff was capable of performing his past relevant work as it is generally performed, identified by the vocational expert as a pipe coverer and insulator, explaining as follows:

> According to the vocational expert, the claimant's past relevant work, as identified by the undersigned, was as a pipe coverer and insulator (DOT# 863.381-014). The vocational expert further testified that this was skilled work with an SVP of 8 that is generally performed at the medium exertional level, but it was actually performed

by the claimant at the heavy exertional level. As required by SSR 82-62, this work was substantial gainful activity, was performed long enough for the claimant to achieve average performance, and was performed within the relevant past. When the undersigned asked the vocational expert if a hypothetical individual with the claimant's residual functional capacity could perform his past relevant work, the vocational expert confirmed that such an individual could perform his past relevant work as it is generally performed in the national economy at the medium exertional level.

In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant was able to perform it as generally performed. This finding is consistent with the testimony of the vocational expert. Accordingly, the undersigned finds that the claimant is capable of performing past relevant work.

R. 591.

Plaintiff challenges this finding, arguing that the vocational expert conceded that she could not find an exact match in the Dictionary of Occupational Titles ("DOT") for Plaintiff's description of his past relevant work and that the DOT title identified by the vocational expert, "pipe cover insulator (ship-boat mfg)" was limited to the ship and boat industry and not related to commercial buildings as described by Plaintiff. *Plaintiff's Memorandum of Law*, ECF No. 14, pp. 20, 22. Plaintiff's argument is not well taken. Plaintiff testified about his past relevant work, explaining that he attended a union insulator apprenticeship after high school and that he actually worked as an insulator for 35 years until he stopped working in December 2008. R. 614−16. When asked about his duties, Plaintiff testified that he insulated mechanical systems in industrial and commercial buildings, including refineries, nuclear power plants, coal fired power plants, office buildings, and hospitals. R. 616. Plaintiff explained that the "work involves a lot of climbing, crawling around. Like, the climbing could be 100 feet or more on scaffolds" and that he sometimes lifted and carried up to 100 pounds. *Id*. When asked by the ALJ to classify this past relevant work, the vocational expert responded as follows: "The best DOT title is that of Pipe Coverer and Insulator: 863.381-014, SVP 8, highly skilled, medium in the DOT. But per his

testimony and Exhibits 2, 3, 4 at 11E [a form completed by Plaintiff regarding his work background], it was performed upwards of heavy." R. 635. Plaintiff's counsel then examined the vocational expert on this point, and asking specifically why the vocational expert selected a title with a ship and boat industry designation:

> Q Ms. DiTrinco, I'm looking at the DOT. You said it's Coverer and Insulator. And then in parentheses, it says ship, boat, mfg. Do you know what that means?
>
> A Yes. That specifically says that's the industry - -
>
> Q Okay. What's the - -
>
> A - - in which that job was performed. But just reading the entire description, seemed to fit best out of all the other titles in this area.
>
> Q So this particular DOT isn't just for working on ships and boats and things like that, right? This could be – I'm wondering, is this just applicable to people who do pipe covering and insulation on ships and boats?
>
> A No, because then when you read the greater description, it's more - - it's very consistent with his testimony in terms of the things that he the venues in which he worked. So that's why I still felt like it was the best title.
>
> Q Is - - and - -
>
> A It's not limited to ships and boats.
>
> Q Okay. And I guess there's not a specific DOT because I'm sure you would have given it to us -- that doesn't speak to insulating on ships and boats? It's not like there's something for commercial insulator?
>
> A No, not that was -- this was most consistent with what he filled out in the exhibits and what his testimony was. And given his experience and being in the union and going through the apprenticeship program, I just felt like it was the best title. The only other one I would have considered, and I did consider, was Insulation Worker. Let me just look at the code for that one. You know, and that one, the industry there was construction, and so that was the first title I considered, Insulation Worker. But it was still an apprentice. And given that he was beyond that and had the number of years of work experience, that was the only reason why I didn't go with that title, even though it was more general in terms of the industry. And I felt like the SVP was higher than a 6. So that's why I went with what I did.

Q And what's that -- just out of curiosity, what's the DOT for that other code that you were referring to, the Insulation Worker?

A 863.364 010.

Q And is that medium, as well?

A Yes. SVP 6. But again, it was still the apprentice, which is why I didn't cite it.

R. 637−39.

In light of this testimony, this Court concludes that the issue of how to characterize Plaintiff's past relevant work was fully explored and explained at the administrative hearing. R. 635−39. In classifying Plaintiff's past relevant work as a Pipe Coverer and Insulator, the vocational expert relied on Plaintiff's own hearing testimony describing his job duties and on Plaintiff's own written description of those duties. R. 635; *see also* SSR 82-62 (stating, *inter alia*, that "[t]he claimant is the primary source for vocational documentation"). The ALJ's reliance on the vocational expert's testimony in this regard therefore enjoys substantial support in the record. *See id*.; SSR 82-62; *cf. Sargent v. Comm'r of Soc. Sec*., 476 F. App'x 977, 980 n.1 (3d Cir. 2012) ("Both the ALJ and the [vocational expert] relied on the classifications in the DOT, as the applicable regulations permit."); *Estevez v. Comm'r of Soc. Sec*., No. CV 14-6337, 2016 WL 3381227, at *7 (D.N.J. June 8, 2016) ("A vocational expert may rely on the DOT, and the ALJ may rely on the VE's testimony to the extent it is consistent with the DOT."); *Tyler v. Astrue*, No. C.A. 10-599-LPS, 2012 WL 4497418, at *9 (D. Del. Sept. 28, 2012) (finding that "[t]here was substantial evidence to support the ALJ's determination that Plaintiff's past relevant work was properly characterized" in light of the testimony of the claimant and the vocational expert).

Plaintiff next contends that the vocational expert's testimony that Plaintiff can perform his past relevant work as a pipe coverer and insulator as generally performed at the medium

27

exertional level in the national economy does not constitute substantial evidence because the vocational expert had never seen this job performed and admitted that the DOT's description of the work as requiring medium exertion might be outdated and could in fact require heavy exertion. *Plaintiff's Memorandum of Law*, ECF No. 14, pp. 21–22 (citing, *inter alia*, R. 639); *Plaintiff's Reply Brief*, ECF No. 16, p. 2 (same).

This Court disagrees. In advancing this argument, Plaintiff relies on the following exchange between his counsel and the vocational expert at the 2019 hearing:

> Q Got you. Now, have you seen this job, the Pipe Coverer and Insulator job performed, or placed anybody in that job?
>
> A No, and no.
>
> Q Okay. So you're not sure if the actual job has changed in terms of the way it's performed since we have, you know, the DOT definitions, which is decades old at this point?
>
> A I mean, I think, still the description is very consistent with his testimony and how he completed the forms in the exhibits.
>
> Q Except for the exertion [of medium], right?
>
> A Except for the exertion, yes.
>
> Q *So you wouldn't be able to tell us whether the DOT is actually a true reflection of how that job is performed now in terms of exertion, what it would take now in terms of exertion? It could differ?*
>
> A It *could* differ.

R. 639 (emphasis added). Plaintiff's argument that the vocational expert could not confirm that the occupation of pipe coverer and insulator still requires only medium exertion is based on mere speculation that the occupation "could" now be different. *See id*. Plaintiff points to no evidence– such as specific, contrary job information in the record from a reliable source–that the exertion required of this occupation as generally performed in the national economy is different than the

DOT description. Without such evidence, Plaintiff's argument amounts to nothing more than rank speculation that the DOT is outdated, which is insufficient to satisfy Plaintiff's burden at step four. *See Rush v. Berryhill*, Civ. No. 17-939, 2018 WL 4257930, at *1 n.1 (W.D. Pa. Sept. 6, 2018) ("[C]ourts in the Third Circuit that have addressed the matter have continued to find the DOT to be an appropriate source of occupational information and have declined to require ALJs and VEs to consult other sources in addition to the DOT.") (citations omitted); *Benjamin v. Berryhill*, No. 3:17-CV-01698, 2018 WL 6072035, at *14 (M.D. Pa. Sept. 21, 2018), *report and recommendation adopted*, No. 3:17-CV-1698, 2018 WL 6065425 (M.D. Pa. Nov. 20, 2018) ("[T]he claimant adduced no evidence in support of her claim that the video monitor (surveillance system monitor) job listed in the Dictionary of Occupational Titles is outdated, without which we are constrained to reject her claim of error."); *Sanabria v. Comm'r of Soc. Sec.*, No. 2:15-CV-8963, 2017 WL 436253, at *4 (D.N.J. Jan. 31, 2017) ("Although Plaintiff may disagree with the relevance of the Dictionary of Occupational Titles ("DOT") in the modern-day work force, 'the DOT remains an appropriate source of occupational data.'") (quoting *Coates v. Colvin*, No. CIVA 14-0265, 2014 WL 4792199, at *4 (W.D. Pa. Sept. 24, 2014)). For these reasons, the ALJ's finding that Plaintiff could perform his past relevant work, and is therefore not disabled, enjoys substantial support in the record.

## V.   CONCLUSION

For these reasons, the Court **AFFIRMS** the Commissioner's decision.

The Court will issue a separate Order issuing final judgment pursuant to Sentence 4 of 42 U.S.C. § 405(g).

Date:  February 17, 2022                    *s/Norah McCann King*
                                  NORAH McCANN KING
                                  UNITED STATES MAGISTRATE JUDGE